**FRANK COULSON, INC.—BUICK,**
Plaintiff-Appellant,

v.

**GENERAL MOTORS CORPORATION,**
Defendant-Appellee.

No. 71–3635.

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1974.

F. Kendall Slinkman, West Palm Beach, Fla., for plaintiff-appellant.

L. Martin Flanagan, John R. Beranek, Thomas W. Watkins, West Palm Beach, Fla., for defendant-appellee.

Before GEWIN, COLEMAN and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

The mutually profitable relationship between an automobile manufacturer and its dealer sometimes ends in an unpleasant separation. In this particular instance, like numerous other disputatious counterparts, litigation ensued.[1] Frank Coulson, Inc.—Buick[2] (Coulson), formerly a Buick dealer in Florida, brought suit in the Florida state courts against the General Motors Corporation (GM). Coulson asserted two independent grounds for relief: (1) Through duress and undue influence wrongfully exerted by GM, Coulson was forced to sell its dealership assets; and (2) GM had maliciously interfered with the contractual negotiations between Coulson and the dealership purchaser.[3] General Motors removed the case to federal district court because of diversity of citizenship. On the basis of special interrogatories, a jury found against Coulson on its first theory—forced sale. It awarded damages of $25,000, however, on the second theory—interference with contractual negotiations. The trial judge set aside the jury verdict by granting GM's motion for judgment notwithstanding the verdict and Coulson appeals. We vacate and remand with directions.

Coulson had been at least a moderately successful dealership enjoying steadily increasing sales. In 1970 GM received two letters highly critical of the dealership. The letters allegedly had a substantial influence on Buick execu-

---

1. On April 16, 1973, a panel of this court entered a decision in this case. By order of April 25, 1973, the court vacated that opinion.

2. This action was originally brought in the name of Frank Coulson, as an individual, but upon stipulation of counsel the complaint was amended to substitute Frank Coulson, Inc.—Buick as plaintiff. Frank Coulson is the president of the Coulson corporation.

3. Both theories for recovery were based on the common law, and Coulson did not rely on the Dealer's Day in Court Act, 15 U.S.C. § 1221 et seq. (1970).

tives and shortly after their receipt Coulson received a series of visits from GM representatives. Frank Coulson, corporation president, claimed that the visits were part of a plan by GM to force a sale of the dealership assets.

GM representatives apparently suggested that Frank Coulson, age 65, was getting old and should bring a younger man into the business. Coulson agreed to negotiate the sale of his dealership assets, and authorized GM to solicit buyers. In the course of finding buyers GM apparently "spread the word" that Coulson was going out of business. Coulson testified that dissemination of this information caused a decline in sales. He maintained that GM also coerced his sale by demands for unnecessary repairs on his facilities. Furthermore, Gene Miller, the Zone Manager for GM, allegedly intimated that the Coulson franchise would not be renewed. Nevertheless, the franchise was renewed in November 1970, one month before the eventual sale.

Coulson did enter into negotiations for the sale of the dealership assets with Glenn Ralph, a Buick dealer from New York. Frank Coulson testified that in April 1970 he and Ralph agreed on a sales price of $100,000. Gene Miller, however, notified Ralph and Coulson that as GM's Zone Manager he would not approve a sale for any amount in excess of $50,000. GM's approval was essential because without it a purchaser would not receive the necessary Buick franchise.

Coulson testified that $50,000 was the value of the corporation's tangible assets alone—$25,000 in parts and $25,000 in equipment. Thus, a sale at that price would allow nothing for intangible goodwill. Expert testimony was presented by Coulson that the dealership's goodwill might be worth as much as $400,000. Even GM's expert admitted that Coulson's good-will was worth between $35,000 and $50,000. Moreover, GM recognized that Coulson's parts were worth $25,000. Although GM contends that the dealership's furniture, fixtures and equipment had been depreciated to zero, Mr. Miller seemed to recognize the value of $25,000. On cross examination Miller testified that the way he "looked at it" all Coulson had to sell were tangible assets.

Coulson and Ralph eventually consummated a sales transaction. In the written documents the sales price was stated to be $50,000. Additionally, Mr. and Mrs. Coulson entered into a $35,000 transaction with Kengle Realty, a New York corporation owned by Glenn Ralph and his brother. This transaction, in a rather complex manner, related to real estate improvements upon the premises in which the Coulson dealership was located. Ralph testified that the two transactions were actually part of the sale, and thus the actual price of the dealership was $85,000. According to Ralph, the second agreement, which related to the real estate, was designed to keep the true price concealed from GM. In response to a special interrogatory the jury found that the $35,000 transaction was indeed separate from the sale of the dealership assets.[4]

The district court submitted each of Coulson's grounds for recovery to the jury. The first theory of recovery, that GM had coerced Coulson in bad faith into a sale, was contained in the following interrogatory:

Do you find from a preponderance of the evidence that the defendant, General Motors, was guilty of bad faith in its dealing with plaintiff?

The jury responded in the negative. Coulson's second ground, that GM maliciously interfered with its negotiations

4. The jury answered special interrogatory No. 1:
   Do you find from a preponderance of the evidence that the $35,000.00 promissory note which was executed and delivered by Kengle Realty, Inc. to Mr. and Mrs. Coulson was part of the purchase price which Ralph paid to the Coulson corporation for the purchase of the dealership business?
   Answer "yes" or "no"
   ANSWER "No"

once they were under way, was embodied in another interrogatory:

> Do you find from a preponderance of the evidence that the defendant, General Motors, is guilty of malicious interference with the plaintiff's contract negotiations with Ralph?

The jury answered "Yes." The jury, therefore, found that although GM did not coerce Coulson to sell, it had interfered with negotiations for the sale.

The district court granted GM's motion for judgment notwithstanding the verdict assigning three reasons as a basis for its decision: (1) the jury's finding of no bad faith indicated that there was no substantial evidence of malicious interference; (2) GM was privileged to intervene and there was no substantial evidence that it overreached this privilege; (3) the evidence was clear and overwhelming that Coulson had suffered no damage from GM's alleged interference in the contract negotiations. GM has properly urged us to judge the correctness of the result reached by the trial court, not the reasons relied upon. Since we view the result as error, however, we must necessarily explain our differences with the lower court.

■ The district court's first assigned reason was based upon the inconsistency of a finding of no "bad faith" with a finding of "maliciousness." We admit that in common usage "bad faith" may be an element of "maliciousness." As we understand Florida law, however, a strict legalistic concept of maliciousness is not an element of an action based on interference with a prospective con-

tractual relationship. In Florida, malice will be inferred where the interference is shown to be intentional.[5] Furthermore, we are convinced that the jury was entirely justified in treating the bad faith interrogatory as applicable to Coulson's first theory—forced sale.[6] Coulson's second theory was contained in the malicious interference interrogatory. We find that the jury's answers are consistent with its award to Coulson Corporation.

■ Next, we shall consider the trial court's finding that Coulson suffered no damage from any alleged interference by GM. This conclusion by the trial court is based upon the determination that the sales price was $85,000, not $50,000. This deduction, of course, amounts to a rejection of the jury's answer to special interrogatory No. 1.[7] The proper test for deciding a motion for judgment notwithstanding the verdict was established by this circuit in Boeing v. Shipman:[8]

> "[T]he court should consider all of the evidence . . . in the light and with all reasonable inferences most favorable to the party opposed to the motion. . . . [I]f there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied, . . . [I]t is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."

---

5. See Dade Enterprises v. Wometco Theatres, 160 So. 209, 210 (Fla.1935); Symon v. J. Rolfe Davis, Inc., 245 So.2d 278, 280 (Fla.App.1971), cert. denied, 240 So.2d 36 (Fla.Sup.Ct.1971). This is in accord with the general rule that actual malice need not be demonstrated. An intentional invasion of plaintiff's interests in any substantial manner may be sufficient to support a recovery if such an invasion is not a privileged one. W. Prosser, Handbook of the Law of Torts, § 129, at 927, 928, 942 and § 130 at 952 (4th Ed. 1971).

6. The term "bad faith" was fully explained to the jury in the instructions. It was explicitly pointed out that "bad faith" meant coercion, duress or intimidation. These are terms used by Coulson to describe its first theory. GM recognizes that the jury finding of no bad faith was in respect to Coulson's decision to sell.

7. See note 4, supra.

8. 411 F.2d 365, 374 (5th Cir. 1969).

Viewed in this light the jury's finding should stand if there is substantial evidence to support it.

■ The jury heard Frank Coulson testify that the $35,000 was not part of the price of the dealership assets. His credibility could have been assessed by the jury as greater than that of Glenn Ralph. The jury knew that Coulson's testimony was corroborated by the written contract. It was known that Glenn Ralph's financial interest in Kengle Realty, the party to the $35,000 note, was not identical to his financial interest in Glenn Ralph Buick, Inc. A careful analysis of the record clearly indicates to us that the testimony of Coulson as to value was supported in some respects by testimony introduced by GM. Miller testified for GM that the tangible assets were worth $50,000 and he would allow no value for intangible assets. Everett Nowlen, the Certified Public Accountant, used as an expert witness by GM, testified that the intangible assets could be worth as much as $50,000. Glenn Ralph readily admitted that the business had a distinct value as a going concern. We believe this amounts to substantial evidence to support the jury's conclusion.

Of course, we concede that substantial evidence existed to support GM's version of the $35,000 transaction. Even if the jury was in error on this issue, however, it does not follow that Coulson was not damaged by the alleged interference of GM. Coulson has asserted that GM's entire course of interference reduced its sales price from what it otherwise would have been. The jury agreed.

■ The trial court's final reason for granting the judgment notwithstanding the verdict was the lack of substantial evidence that GM overreached its privilege to intervene. The scope of the privilege to intervene in contractual negotiations is not clearly defined under Florida law. We find no reason to presume, however, that Florida is not in accord with the weight of authority.[9] It is generally recognized that tort liability exists for interference with a prospective contractual relationship. The cause of action has run parallel to that for interference with existing contracts.[10] As is the case with existing contracts any manner of intentional invasion of the plaintiff's interests may be sufficient if the purpose is not a privileged one.[11] When the plaintiff proves a prima facie case of interference, the defendant has the burden of avoiding liability by showing that his conduct is privileged or justified.[12]

■ This branch of the law, unlike others, has not crystallized a complete set of definite rules as to the existence or non-existence of a privilege.[13] Various important factors have been identified, however, which relate to an appraisal of the private interests of the parties involved as well as to a consideration of the social utility of these private interests.[14] The principal issue thus becomes whether the social benefits derived in permitting acts of intervention outweigh the harm to be expected therefrom.[15] Therefore, if Coulson established a prima facie case of interference, GM had the burden of justifying its activity based upon social policy.

■ On the basis of all the evidence presented, the jury certainly could have believed that GM's zone manager, Miller, stated to Frank Coulson and Glenn

---

9. Florida decisions on inducing breach of contract are summarized in Brunswick Corporation v. Vineberg, 370 F.2d 605, 609 (5th Cir. 1967).

10. W. Prosser, Handbook of the Law of Torts § 130 at 949, 952 (4th Ed. 1971).

11. *Id.* The scope of privileged conduct is narrower in the case of an existing contract, however. *Id.* at 954.

12. *Id.* at 942, 953; 45 Am.Jur.2d Interference, § 56 at 330 (1969).

13. Restatement of Torts § 767 (Comment a.) (1957).

14. *Id.*

15. Annot., 16 A.L.R.3d 1191, 1221 (1967).

Ralph that he would not approve a sale for a price exceeding $50,000. Furthermore, the jury could have concluded that such statements disrupted contractual negotiations and reduced Coulson's sale price. Proof of intentional interference and resulting damage are sufficient to establish Coulson's prima facie case.

 GM has a strong private interest in the success of its dealerships. This interest will justify intervention for proper business purposes.[16] GM is privileged to approve or disapprove a purchaser, for example, because it can demonstrate strong and legitimate business interests to justify such action. It will deal with the purchaser in the future and he will represent Buick to the public. The purchaser's integrity is justifiably important.

GM's privilege to intervene as to the dealer's sale price is similarly limited to justifiable business interests. It has been recognized that manufacturers, like GM, have an interest in ensuring that new dealers are financially sound.[17] Such an interest does not grant GM an absolute privilege, however, to limit a dealer's sales price. An expansive construction would give GM the privilege to impose undue economic pressure on its outgoing dealer, in whose business its interest is terminated, and to unduly benefit the incoming dealer's financial strength by exercising a powerful veto and refusing to approve a proposed sale of the dealership except at a grossly inadequate price. In the instant the case the limitation imposed by GM's zone manager was $50,000, the value of the tangible assets. As stated earlier, GM's own expert accountant testified that Coulson's good will was worth between $35,000 and $50,000. Coulson's witness would have placed it much higher. Furthermore, GM's zone manager had no knowledge of Ralph Buick's financial condition when the $50,000 limit was set. It is apparent that the $50,000 limitation bore no reasonable relation to the future financial solvency of Glenn Ralph Buick, Inc.

After giving due consideration to all of the evidence disclosed in the record, we hold that there was indeed substantial evidence to support the findings of the jury. Accordingly, the jury's verdict in favor of Coulson Corporation must be reinstated. The judgment of the district court is vacated and the case is remanded for proceedings consistent with this opinion.

Vacated and remanded with directions.

---

16. *Cf.* Zoby v. American Fidelity Co., 242 F. 2d 76, 80 (4th Cir. 1957).

17. Pierce Ford Sales, Inc. v. Ford Motor Co., 299 F.2d 425, 429 (2d Cir. 1962).