**VALLEY LIQUORS, INC., an Illinois Corporation, Plaintiff-Appellant,**

v.

**RENFIELD IMPORTERS, LTD., Defendant-Appellee.**

No. 86–1040.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1986.

Decided June 3, 1987.

Rehearing and Rehearing In Banc Denied July 13, 1987.

Richard J. Prendergast, Richard J. Pendergast, Ltd., Chicago, Ill., for plaintiff-appellant.

Morton Siegel, Siegel, Moses & Schoenstadt, Chicago, Ill., for defendant-appellee.

Before WOOD, COFFEY and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Valley Liquors, Inc. ("Valley"), an Illinois corporation, appeals from a district court order granting summary judgment in favor of defendant Renfield Importers, Ltd. ("Renfield"). Specifically, Valley contends that the district court erred in granting summary judgment for Renfield on

Valley's claims that Renfield and others had conspired to fix prices in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982) (Count I), that Renfield's decision to terminate Valley in three counties unreasonably restrained trade, also in violation of 15 U.S.C. § 1 (Count II), and that Renfield breached its distributorship agreement with Valley (Count III). We affirm the district court's judgment as to all three counts.

## I. FACTUAL BACKGROUND

Valley Liquors, Inc. is a wholesale distributor of alcoholic beverages. Renfield Importers, Ltd. is an importer and national distributor of various brands of distilled spirits and wines, including Gordon's Vodka, Gordon's Gin, and Giacobazzi wine. Before November 1, 1981, Valley had been one of Renfield's distributors for over twenty-six years, having a territory throughout Illinois. The majority of Valley's sales for Renfield took place in the northern Illinois counties of McHenry and DuPage, and portions of Cook County. Other Renfield distributors in those counties, and thus Valley's competitors, were Romano Brothers Beverage Company ("Romano") and Continental Distributing Company, Inc. ("Continental").

In July 1981, Renfield met separately with Valley, Romano, and Continental, and suggested that it was contemplating a realignment of its entire Illinois distributorship network. In October 1981, Renfield informed its distributors of its changes. Renfield told Romano that it would gain the right to sell Gordon's Vodka and Henkell Sparkling Wines and would become the exclusive distributor of Renfield's Sonoma Wines, but that it would lose its exclusive distributorship of Giacobazzi wines. Renfield told Continental it would no longer have the right to serve as exclusive distributor of Gordon's Vodka in Cook County and would not distribute Renfield's Piper Heidseick Champagne, Henkell Sparkling Wines and Sonoma Wines. Both Romano and Continental were initially angry and upset over the changes in their rights, but after meetings with Renfield decided to accept the realignment. Renfield then advised Valley on October 22 that it would be eliminating Valley effective November 1, 1981, as Renfield distributor in DuPage, McHenry, and Cook counties. Valley would, however, retain the exclusive right to distribute Renfield's products in the counties of Will, Winnebago, Carroll, Boone, Bureau, and Whiteside; and would have the dual right to distribute Renfield's products in DeKalb, Kane, and Kendall counties.

Valley brought suit against Renfield on November 10, 1981, alleging that Renfield had breached its contract with Valley by terminating Valley in bad faith and had violated the Sherman Act, 15 U.S.C. § 1 (1982), in two respects—by conspiring with others to fix prices and by unreasonably restraining trade in terminating Valley as distributor in three Illinois counties. Valley also filed a contemporaneous motion for a temporary restraining order and preliminary injunction. After conducting a hearing, the district court on November 17, 1981, denied Valley's motion for preliminary injunction. Valley appealed, and this court affirmed.[1] *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742 (7th Cir.1982) (*Valley I*).

Renfield subsequently filed a motion for summary judgment. The parties proceeded with discovery. Valley filed an amended complaint, and Renfield filed a motion to

---

**1.** In rejecting Valley's claim that Renfield and Valley's competitors had conspired to terminate Valley and thereby increase wholesale prices of Renfield products, we held that the circumstantial evidence in the limited preliminary injunction record was "too tenuous to require the trier of fact to draw the inference [of a conspiracy] that Valley asked him to draw" and that "plaintiff did not prove an improper motive by its supplier." *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 744 (7th Cir.1982).

We also rejected Valley's contention that Renfield's termination of Valley was an unreasonable restraint of trade. We noted that Valley had not sought to prove Renfield's market power, which we held is a preliminary and necessary step in establishing illegality under the balancing test set forth in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57 n. 27, 97 S.Ct. 2549, 2561 n. 27, 53 L.Ed.2d 568 (1977). 678 F.2d at 745.

dismiss Count III of that complaint, a breach of contract claim. The parties continued discovery and filed various materials regarding Renfield's motion for summary judgment.

On December 31, 1985, the district court granted Renfield's motion for summary judgment on all three counts of Valley's amended complaint.[2] Valley appeals.

## II. ANALYSIS

Valley challenges the district court's grant of summary judgment on each of the three counts of its amended complaint. Our framework for analyzing Valley's contentions regarding the grant of summary judgment is as follows. After Renfield moved for summary judgment, Valley had the responsibility of going beyond the pleadings and setting forth "specific facts showing that there [was] a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A grant of summary judgment was then proper if "there [was] no genuine issue as to any material fact and if [Renfield was] entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). We must decide whether the district judge correctly determined that there were no "*genuine* factual issues that properly [could] be resolved only by a finder of fact because they [could] reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis added).

■ A genuine issue for trial only exists when there is sufficient evidence favoring

the nonmovant for a jury to return a verdict for that party. *Id.* As the Supreme Court has stated, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). We must not weigh the evidence.[3] *See Staren v. American National Bank & Trust Co.*, 529 F.2d 1257, 1261 (7th Cir.1976). Instead, we must see if the nonmovant's evidence is sufficient. In determining whether evidence is sufficient, we must of necessity consider the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at a trial on the merits. *Anderson*, 106 S. Ct. at 2512. In addition, we draw all inferences in favor of the nonmovant. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir.1986); *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir.1986). Such inferences, however, must be "justifiable." *Anderson*, 106 S.Ct., at 2513; *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Bartman*, 799 F.2d at 312–13; *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1218 (7th Cir.1985).

Thus we will find that the district court properly granted summary judgment for Renfield on each of the three counts of Valley's amended complaint if we determine that there was no genuine issue of material fact for trial, which turns on our decision that there was insufficient evidence, taking into account the evidentiary standard of proof and drawing all reasonable inferences in Valley's favor, to allow a rational jury to decide for Valley.[4]

---

**2.** The district court properly treated the motion to dismiss Count III as a motion for summary judgment on that count pursuant to Fed.R.Civ.P. 12(b).

**3.** Valley asserts that the district court acted improperly in weighing the evidence. Valley does not, however, provide any examples. We find that the district court properly considered Valley's evidence, took inferences in Valley's favor, and decided that the evidence was not adequate to persuade a reasonable jury that Renfield conspired to modify Valley's distribution rights.

**4.** Valley argues that the above standards for summary judgment should be considered in light of a general reluctance to grant summary

judgment in complex antitrust litigation. Valley cites *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) and that Court's statement that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."

Recently, however, courts have not displayed such hesitation to grant summary judgment in antitrust cases. In *Matsushita Electric Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), a recent antitrust case involving section 1, the Supreme Court did not cite *Poller* and was not reluctant to affirm a

## A. Count I—Conspiracy

■ Valley argues that the district court improperly granted summary judgment on Valley's claim that Renfield conspired with Romano and Continental to fix prices, conduct that is illegal *per se* under the Sherman Antitrust Act, 15 U.S.C. § 1 (1982).[5]

Although our summary judgment analysis employs the above legal framework, when analyzing a section 1 conspiracy claim, we apply the standard established in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and reaffirmed in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The inferences drawn from underlying facts must be viewed in the light most favorable to the nonmovant, but "antitrust law limits the range of permissible inferences from ambiguous evidence in a [section] 1 case." *Id.* at 1357. The *Matsushita* court reaffirmed its holding in *Monsanto* that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.; see id.* at 1362 n. 21. "[A] plaintiff seeking damages for a violation of [section] 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* at 1357 (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471). In other words, to successfully contest a motion for summary judgment, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Id.* This is the standard Judge Posner appears to have articulated in *Valley I*, 678 F.2d at 744, when he stated, "[i]t is therefore not enough to show that Continental and Romano, acting separately ... wanted to get rid of a competitor; there must also be evidence that in terminating Valley Renfield was acceding to their desire rather than acting to promote an independent conception of its self-interest."

■ Valley fails on this essential point because it has not provided evidence tending to exclude the possibility that Renfield acted independently, or that would show

grant of summary judgment. Indeed, the Court appeared to encourage the use of summary judgment where appropriate in *Matsushita* and two other cases handed down the same term, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, in another decision handed down during the 1985 term, the Supreme Court rejected a reading of *Poller* that would mean that a party could defeat a "properly supported" summary judgment motion "without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve" the defendant's denial of a claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). This court has stated in *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163 (7th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), that summary judgment should be a favored practice in antitrust cases.

The very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also ... the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation.... The ultimate determination, after trial, that an antitrust claim is unfounded, may come too late to guard against the evils that occur along the way.

*Id.* at 1167. *See Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 (4th Cir.1985) ("Summary judgment clearly remains, however, an appropriate procedure in antitrust litigation. Rule 56 should not be 'read out of antitrust cases.'" (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

5. Valley asserts that Renfield engaged in a *horizontal* conspiracy. Alleged price fixing between a manufacturer and distributors, however, is more properly termed a "vertical" conspiracy. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir.1985); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1007 (5th Cir.1981), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). A horizontal conspiracy occurs when the source of a conspiracy is a combination of distributors. *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245 (5th Cir.1978). The actual label placed on the conspiracy is a "pedantic distinction," *see Valley I*, 678 F.2d at 744, as the *Monsanto* standard applies regardless of which label is attached. *Burlington Coat Factory*, 769 F.2d at 923.

that the inference of conspiracy to fix prices is reasonable in light of the competing inference of independent action. Valley has not proffered any direct evidence that would show that the separate meetings between Renfield and Romano and Continental were conspiratorial, or that would suggest that these meetings were anything other than unilateral notifications of Renfield's realignment plans. Neither is there any evidence that Continental and Romano, or Renfield, for that matter, communicated with each other at those meetings regarding Valley. Thus Valley urges us to find that the circumstantial evidence surrounding the events leading to the changes in its distribution rights leads to an inference of conspiracy.

Valley argues that price complaints and circumstances regarding Renfield's separate meetings with Continental and Romano preceding the realignment lead to an inference that Renfield conspired with Valley's competitors, Romano and Continental, to terminate Valley. Renfield's realignment occurred against a backdrop of price competition between Valley and Romano and Continental, Valley typically undercutting Romano and Continental by five percent. Valley alleges that Romano and Continental had previously complained to Renfield that because of Valley's pricing policies, they were forced to lower their prices to retailers and thus could not make money distributing Renfield products. Valley has not shown, however, that the complaints were directed specifically at Valley. Renfield representatives, on whom Valley relies for evidence of price complaints, testified that all three distributors, including Valley, complained about the prices of every other distributor. As the *Monsanto* Court noted, such complaints "'are natural.'" *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470 (quoting *Monsanto's* brief).

Valley recognizes, in any event, that the *Monsanto* Court specifically stated that price complaints alone followed by a termination are not enough to support an inference of conspiracy. *Id.* at 764, 104 S.Ct. at 1470. Valley apparently attempts to argue that the price complaints in addition to the evidence of separate meetings between Renfield and its distributors lead to an inference of conspiracy. Renfield conducted independent and separate meetings with Romano and Continental in October to inform them of the realignment. Both Romano and Continental were angry about the changes brought by the realignment. Continental's president, Cooper, immediately broke off his meeting with a Renfield representative when he learned that he would no longer be distributing various wines and that he would no longer be an exclusive distributor of Gordon's Vodka in Cook County. Renfield postponed the meeting it had scheduled with Valley to advise Valley of the changes. At that time Cooper had no knowledge of how Renfield's realignment would affect Valley. Cooper then met with Renfield's president in New York, and immediately upon his return to Illinois, accepted the Renfield distributorship changes. After Cooper's acceptance of the plan, Renfield informed Valley of the plan, ten days before it was going to implement the changes and thus terminate Valley's distributorship rights in three counties. Valley argues that the combination of Continental's and Romano's dissatisfaction with Valley's pricing policies and Cooper's acceptance of the realignment upon his return from New York leads to an inference that Cooper, as president of Continental, accepted the changes in his distributorship rights as a quid pro quo for Renfield's termination of Valley.

We cannot agree that the above circumstances support an inference of conspiracy. Cooper's delay in accepting the plan is just as consistent with, and perhaps more consistent with a general unhappiness with the severe cutbacks in his rights than it is with an inference that he was dealing or conspiring with Renfield to terminate Valley. As we stated in *Valley I*, 678 F.2d at 743, the hypothesis that Continental and Romano demanded and received Valley's termination as a quid pro quo for the changes in their rights is "too speculative to compel a trier of fact to infer conspiracy."

Were we to determine that the evidence supported an inference of conspiracy, however, we would find that such an inference

would not be reasonable in light of the competing inferences of Renfield's independent action. The evidence regarding the separate meetings between Renfield and Continental and Romano is ambiguous at best and does not help to exclude the possibility that Renfield acted independently. Renfield had informed the three distributors the previous July that it was contemplating a realignment. Continental's president Cooper at that time told Renfield that he would be "very unhappy" if Continental lost the right to remain as Renfield's exclusive distributor of Gordon's Vodka in Cook County. Renfield made severe changes in the rights of all three distributors, and all three were unhappy. Both Romano and Continental lost some exclusive rights. Romano lost an exclusive right to sell a certain brand of wine, and Continental lost an exclusive right to sell Gordon's Vodka in Cook County and the right to distribute various wines. If Romano and Continental had as much influence with Renfield as Valley claims they had, it is difficult to imagine why they would have agreed to such distasteful curtailments of their rights.

Valley also notes that Valley was Renfield's best-selling distributor among the three competing distributors and that Renfield's sales in Illinois declined 21% in the year following the realignment, and asserts that these facts should lead to the inference that Renfield terminated Valley after conspiring with Romano and Continental. We agree with the district judge, however, that this demonstrates "at most" that "Renfield exercised bad business judgment in its realignment." That Renfield was "punished" for its decision through subsequent poor sales does not mean it connived with or was influenced by the distributors in making the decision. Renfield's realignment was statewide and Valley was not terminated from the statewide scheme—as the district court noted, "Valley actually *gained* exclusive rights in five counties."

Moreover, Valley has not raised an inference that Renfield conspired with Romano and Continental *to fix prices*. In *National*

*Marine Electronic Distributors, Inc. v. Raytheon Co.*, 778 F.2d 190, 192–93 (4th Cir.1985), the Fourth Circuit affirmed a directed verdict for a defendant who had terminated its relationship with the plaintiff dealer, stating that although price complaints played a part in the decision to terminate the plaintiff, the plaintiff had not introduced sufficient evidence to raise an inference that there was an "agreement to set, control, fix, maintain, or stabilize prices." There was no agreement because the defendant did not require dealers to sell at any particular price, and the dealers set their own prices, competing with other dealers of the defendant and with dealers who sold competing brands of similar products. *Id.* at 193.

■ This case is similar. Renfield may have suggested various prices at which to sell its products, but the presidents of both Romano and Continental testified in depositions that Renfield never threatened that they would be terminated as Renfield's distributors if they did not sell at those suggested prices. In addition, a Valley representative admitted that Renfield never asked Valley to maintain a certain price level. The evidence indicates that although Valley was a price-cutter the dealers set their own prices, and indeed all undercut each others' prices at various times. Even if Valley could show a conspiracy to terminate Valley, it has failed to allege facts that would raise an inference that Renfield, by terminating Valley's distribution rights in three Chicago-area counties, agreed with Romano and Continental to set or control prices.

Valley repeatedly argues that Renfield did not ever give an independent business reason for modifying Valley's distribution rights and thus asks us to infer that the only reason was to fix prices with Romano and Continental. Indeed, Valley maintains that Renfield's own expert conceded that Renfield's decision was not independent. During depositions Valley asked Renfield's expert, John P. Gould, Jr., an extended hypothetical question based on the facts of

this case.[6] Gould was then asked whether he could conclude that the decision to terminate did *not* result from an independent action by the manufacturer. Gould's response is significant. He stated that

the problem I always have with hypothetical rather than dealing with specific cases is that no matter how long the set of assumptions go, there is probably going to be some other circumstances that could come into [sic] affect the decision.... I can point out that if you're saying is my imagination sufficiently accurate to think of a circumstance in which this could happen in which the manufacturer would have decided independently to do it, the answer is yes, I can think if [sic] a case like it.

Gould was further questioned, "Could you also think of a case where he would not have?" He responded, "Yes, I could think of that, too." We agree with Renfield that this is an equivocal response. It cannot support Valley's contention, repeated often in its brief, that Renfield's own expert "conceded" that a trier of fact could conclude that Renfield did not exercise independent business judgment.

Valley further contends that Renfield "disavowed all the hypotheses" for the modifications of Valley's rights advanced by this court in our opinion in *Valley I.* There, we suggested that one independent business reason for terminating Valley might be to eliminate possible free-riding problems.[7] *Valley I,* 678 F.2d at 743–44. Valley's expert testified that two economic theories that would provide reasons for terminating Valley—if Valley were a "free rider" or a "cherry picker"[8]—make no economic sense in this situation, and indeed,

there is no evidence that Valley was a free rider or a cherry picker.

We did not mean to say in *Valley I,* however, that the only independent business reason with legitimacy would be to eliminate free riding. There could be a variety of business reasons why Renfield might terminate Valley. *See, e.g., Souza v. Estate of Bishop,* 799 F.2d 1327, 1329–30 (9th Cir.1986) (defendants' decision to lease rather than sell lands to plaintiffs was based on "understandable and legitimate business reason" of avoiding unfavorable tax consequences); *Garment District, Inc. v. Belk Stores Services, Inc.,* 799 F.2d 905, 909 (4th Cir.1986) ("legitimate, independent reasons for terminating a discounter in response to dealer complaints" include a desire "to avoid losing the business of disgruntled dealers"); *O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1468 (9th Cir.1986) (defendants' explanation for terminating plaintiff mail-order distributor, which was to comply with defendants' policy of selling only by face-to-face transactions and not through mail-order sales, was "plausible and justifiable" and "consistent with proper business practice"); *National Marine Electronic Distributors, Inc. v. Raytheon Co.,* 778 F.2d 190, 191 (4th Cir. 1985) (defendants terminated plaintiff distributor, a mail-order company, after reexamining its market structure and deciding not to pursue mail-order sales); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 921–22 (2d Cir.1985) (defendant terminated plaintiff distributor after implementing retail marketing procedures that distributor did not follow and after deciding to reduce the number of retailer/distributors); *Terry's Floor Fashions, Inc. v. Burlington Indus-*

---

**6.** Specifically, Valley described a situation in which a manufacturer was receiving price complaints from two of its three distributors regarding the third distributor's undercutting of price, the third not being a "free rider" or a "cherry picker." The third distributor was terminated, sales decreased, and the two complaining distributors continued to sell at the same or higher prices.

**7.** Free riders are those retailers who do not engage in promotional activities such as advertising or provide service and repair facilities,

while those services are performed by other retailers. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977).

**8.** A cherry picker is a distributor that exploits only the easiest accounts or the best-selling items of a full line of products, ignoring accounts that are more costly or difficult to serve. A desire to avoid cherry pickers is often a reason given for exclusive distributorships.

*tries, Inc.,* 763 F.2d 604, 614 (4th Cir.1985) (defendant's decision to terminate plaintiff distributor was consistent with defendant's independent marketing strategy of giving certain dealers a price incentive to promote defendant's product and with defendant's antibootlegging policy); *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 671–72 (9th Cir.1980) (defendants' decision to deny credit to plaintiff was "unilaterally determined" and "amply justified by legitimate business considerations" as plaintiff had a poor payment record, repeatedly proffered bad checks, failed to return phone calls, and refused to meet to discuss the balance due). As we stated in *Valley I,* "we are just concerned with whether Renfield may have had reasons for terminating Valley that were independent of the desires of Continental and Romano to be rid of the competition of a price-cutter." *Valley I,* 768 F.2d at 744. Any of those independent reasons would suffice to create an inference of independent action by Renfield.

Despite Valley's assertions to the contrary, Renfield did proffer a reason for the realignment. Renfield's Senior Vice President, Ponti Campagna, said on deposition that the company merely decided to reduce the number of distributors across the board. Campagna stated:

> My actual choice was made for Romano Brothers and for Continental because of the following circumstances: The combined manpower total of Romano Brothers and Continental was greater than the combined manpower of any other combination. I had to make sure that with the increased volume the distributors were receiving and the increased profitability, that we maintained coverage because that was a critical part of our problem. I explained to you that Valley had a portion of Cook County while the Romano Brothers and Continental had Cook, DuPage, Lake and McHenry; so I really considered them having a greater responsibility throughout their entire tenure of Renfield than Valley did. I felt that the combined portfolios of Romano Brothers and Continental might be more beneficial to Renfield, the meld of brands. We compete for business with the distributor in-house. The distributor has salesmen, has a selection of brands to sell. He has other gins to sell, other vodkas to sell, other wines to sell; so I am competing within the house, also. I felt that, in my opinion, that the two distributors, Continental—because of Continental's length of time in the marketplace, their reputation, and the fact that Romano Brothers were very hungry and they needed our line probably more than any other distributor from the standpoint of balance of their portfolio, would give me a better chance to succeed in that marketplace over the long haul. It wasn't a question, sir, of terminating a distributor for lack of performance; it was a question of reducing the total number of distributors in the marketplace. And since it had to go from four to two, it came down to a judgment call, whether [I] made the right decision or wrong decision.

We find Campagna's reason is plausible and sufficient to create an inference that Renfield acted independently. We hasten to note that Renfield does not have to prove that it actually had an independent reason. Under the *Monsanto* standard, it is up to the nonmovant, in this case Valley, to present evidence "that tends to exclude the possibility" that defendant Renfield acted independently. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471. It follows that because Renfield has advanced Campagna's testimony, which leads to an inference of independent action, Valley must refute that inference to succeed.

Valley attempted to refute Renfield's independent business reason through the testimony of its expert, Joseph R. Gunn III.[9] Gunn stated that "the only reason offered by Mr. Campagna was a statement of his judgement [sic], based on available sales forces." Gunn then criticizes the basis for

---

9. Although Gunn specifically states that he has been asked to examine whether Renfield possessed market power and whether Renfield's conduct tended to reduce competition, which are issues relating to Count II and not to Count I, he nonetheless attempts to discredit Campagna's reason for the termination.

Campagna's reason, noting that Campagna "later stated that his calculation had not been made by comparing the several distributors." We need not determine whether Gunn's criticism is valid because a close reading of Campagna's testimony reveals that the sales force issue was only one aspect of Campagna's reasoning. Campagna also stressed that Romano and Continental covered a larger geographical area in the metropolitan Chicago area than did Valley, and that the portfolios of Continental and Romano would be more beneficial to Renfield than would Valley's portfolio. Campagna apparently based his decision on the distributors' capacity for future sales and not necessarily on current sales figures. His testimony suggests that he looked to the strengths of Romano and Continental rather than to the weaknesses of Valley. Valley has provided no evidence, either through expert testimony or otherwise, to refute these aspects of Campagna's decision and thus has failed to exclude the possibility that Renfield acted independently.

Valley finally attempts to argue that various cases on which the district court relied in granting summary judgment instead mandate reversal. Valley asserts that in *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 921–22 (2d Cir.1985) the terminated distributor engaged in free riding, and in that case and in *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 614 (4th Cir.1985), the manufacturer exercised an independent business decision in terminating the distributor.[10] Valley main-tains that those cases are therefore distinguishable from this case. We disagree with Valley's application of the cases. Although there is no evidence that Valley was a free rider, as we noted above Renfield did have independent business reasons for modifying Valley's distribution rights, and Valley has not shown that an inference of conspiracy is reasonable in light of those independent business reasons.

Valley's allegations of price complaints and meetings between Renfield and Renfield's other two distributors are insufficient to create an inference of conspiracy to fix prices. Even if we were to find an inference of conspiracy, such an inference would be unreasonable considering Renfield's proffered independent business reason for modifying Valley's distribution rights. The district court thus properly granted Renfield summary judgment on Count I of the amended complaint.

**B. Count II—Unreasonable Restraint of Trade**

 Valley argues that the district court improperly granted summary judgment on Count II of its amended complaint, which alleged that Renfield's decision to modify Valley's distribution rights was an unreasonable restraint of trade in violation of section 1 of the Sherman Act. Such an allegation is appropriately analyzed under the Rule of Reason as set out by the Supreme Court in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). *See* Pitofsky, *The* Sylvania *Case: Antitrust Analysis of*

---

**10.** Valley also attempts to distinguish *Reborn Enterprises, Inc. v. Fine Child, Inc.*, 590 F.Supp. 1423 (S.D.N.Y.1984), *aff'd*, 754 F.2d 1072 (2d Cir.1985). Valley has mischaracterized *Reborn*. Valley asserts that the district court mistakenly relied on this case because there was evidence in *Reborn* that plaintiff was a free rider and because the plaintiff's president's "churlish behavior," which included persistent threats of suit, provided an independent reason for the defendant to terminate the plaintiff. The *Reborn* court, however, did not discuss either of these factors in relation to the section 1 vertical price-fixing conspiracy claim. The *Reborn* court stressed the plaintiff's president's churlish behavior as a justification for the plaintiff's termination in the context of a discussion of verti-cal territorial restrictions under the Rule of Reason analysis. *See id.* at 1441–42. The *Reborn* court might have considered this independent business reason for termination in its vertical price-fixing conspiracy analysis if it had had the chance. It did not, however, reach that issue because it found that the plaintiff did not provide the probative evidence beyond that of complaints and termination necessary to satisfy the *Monsanto* test. Specifically, the court held that the plaintiff did not "advance sufficient evidence to raise a genuine dispute as to whether defendants engaged in coercive activity to force adherence to its suggested retail price and plaintiffs and other retailers actually adhered to that price." *Id.* at 1439.

*Non-Price Vertical Restrictions,* 78 Colum.L.Rev. 1 (1978); *cf.* Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Slyvania *Decision,* 45 U.Chi.L.Rev. 1 (1977). A threshold inquiry in any Rule of Reason case is whether the defendant had market power, that is, the "power to raise prices significantly above the competitive level without losing all of one's business." *Valley I,* 678 F.2d at 745; *see Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 315–16 (8th Cir.1986); *Hennessy Industries, Inc. v. FMC Corp.,* 779 F.2d 402, 404–05 (7th Cir.1985); *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 191 (7th Cir.1985); *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 265 (7th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *General Leaseways, Inc. v. National Truck Leasing Association,* 744 F.2d 588 (7th Cir.1984) (collecting cases). Valley here attacks a vertical non-price restraint. Only if Valley can allege facts that give rise to an inference that Renfield had sufficient market power to control liquor prices must we proceed to the first step in the Rule of Reason analysis, which is to balance the effects the vertical restraint has on intrabrand and interbrand competition. The restraint is unreasonable if "weighing effects on both intrabrand and interbrand competition, [the restriction] made consumers worse off." *Valley I,* 678 F.2d at 745.

■ We need not reach the first step because the district court correctly found that Valley has not alleged facts that give rise to an inference that Renfield had sufficient market power to control liquor prices in a relevant product and geographic market.

Market power is "normally inferred from the possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography." *Id.* Valley and Renfield agree that the product market is distilled spirits and wines. Regarding the relevant geographical market, Valley asserts that it is the metropolitan Chicago area (including the counties of Cook, McHenry, and DuPage,

wherein Valley was a Renfield distributor). Renfield disagrees, stating that it is the state of Illinois at a minimum and the entire country at a maximum. It does not matter which market we use, because as the below analysis shows, Renfield does not have market power in any of those markets.

The central issue is thus whether Renfield possesses a "substantial percentage of the sales" of distilled spirits and wines in either the metropolitan Chicago area or the state of Illinois or the nation as a whole. Market share analyses in section 1 cases have led to conclusions that approximately 70%–75% of market share constitutes market power, *see Graphic Products Distributors, Inc. v. Itek Corp.,* 717 F.2d 1560, 1570 (11th Cir.1983) and that a 20%–25% market share or less does not constitute market power, *see Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 221 (D.C.Cir.1986) (5%–6% market share), *cert. denied,* —— U.S. ——, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 318 & n. 18 (8th Cir.1986) (approximately 19% market share); *O.S.C. Corp. v. Apple Computer, Inc.,* 601 F.Supp. 1274, 1291 n. 8 (C.D.Cal.1985) (up to 20% market share and existence of substantial competition), *aff'd,* 792 F.2d 1464 (9th Cir.1986); *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750, 761 (D.Md.1980) (20%–25% market share), *aff'd,* 638 F.2d 15 (4th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981). It is also helpful to analogize to section 2 monopoly cases in determining a benchmark figure for "substantial percentage of the sales." In both section 1 and section 2 cases, the purpose of establishing market power is to determine whether the defendant can control the market and thus affect competition. It would therefore appear that the percentages of sales necessary to establish a substantial market share should be relatively comparable. In section 2 monopoly cases, a substantial percentage of the sales is usually at least 50%. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 489 & n. 11 (5th Cir.1984); *see also Dimmitt Agri Industries, Inc. v. CPC In-*

*ternational, Inc.*, 679 F.2d 516, 529–30 (5th Cir.1982) (market share percentages on the order of 25% could not, as a matter of law, support a monopolization claim, at least not in the absence of "other compelling structural evidence"), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 129 (2d Cir.) (presumption that market share below 50% in the absence of other indications of market power sufficient to create a genuine jury issue should lead to summary judgment or directed verdict), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 518.3c (Supp.1986) ("there is substantial merit in a presumption that market shares below 50 or 60 percent do not constitute [market] power"). Without a showing of special market conditions or other compelling evidence of market power, the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%. *Domed Stadium*, 732 F.2d at 490.

Valley does not dispute that Renfield's market share in the metropolitan Chicago area is less than 2%, or that Renfield's market share in the state of Illinois or the entire country is between 2%–3%. This figure is miniscule compared to the 50% usually necessary to constitute a substantial percentage, or even to the 17%–25% which is an absolute minimum necessary to establish market share. Based on these figures, Valley cannot raise a genuine issue of material fact regarding Renfield's market power. Renfield does not have sufficient market share to have the market power necessary to affect prices and therefore harm competition.

Valley argues, however, that market share analysis is a "misleading" criterion of market power. Valley cites a law review article coauthored by then-Professor, now-Judge Richard Posner that states that market share analysis, by itself, is misleading. *See* Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937, 947 (1981). We find that Valley's characterization of that statement is itself misleading. Valley has taken the statement

"market share alone is misleading" out of the context of the Landes and Posner article. In that article, Landes and Posner offer a formula for market power in which market share is one of three separate factors, the other two being "the market elasticity of demand" and the "elasticity of supply of competing or fringe firms." *Id.* at 945. Thus Landes and Posner conclude that "inferences of power from share alone can be misleading." *Id.* at 947. They also note, however, that these elasticities are "not easily determinable (at least by the methods of litigation)" and even when it is possible to estimate the elasticities, it is difficult to choose the proper period of time in which to estimate them. *Id.* at 956. An alternative approach in "determining market power when elasticities are unknown," according to Landes and Posner, "is to use 'guesstimates' of elasticities in defining market in the first place." *Id.* at 970. The adjustments for elasticities are made when the market is carefully defined in terms of product and geography, before market share is determined. Market share and ultimately, market power, will thus differ depending on whether the market is more narrowly or more broadly defined in either product or geographical terms. *Id.* at 960–67. Accordingly, when in *Valley I* Judge Posner defined "market power as the possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography," *Valley I*, 678 F.2d at 745, he was taking into account "guesstimates" of the elasticity factors that make market share, which alone may be misleading, a more reliable indicator of market power.

Valley may actually be arguing that the market share analysis is "misleading" because it is imprecise. That may very well be the case, because the demand and supply elasticities are only "guesstimated" by defining the market carefully, but Valley has not offered any figures for those elasticities that would make the market share analysis more accurate. Valley may have recognized that such figures would not have been helpful to show market power in this case. The undisputed market share of

Renfield in the metropolitan Chicago area, Illinois, or the entire country is so small that it would not seem worthwhile to go to the trouble and expense of computing those figures. We can conceive of a case in which it would be helpful to have, if available, precise figures for supply elasticity and market elasticity of demand along with market share in the market power calculation. That type of case would involve a significantly higher market share—one that borders on the amount "minimally necessary" to establish market power. That situation is not present here. Those elasticity figures would not assist Valley in raising a genuine issue of material fact with respect to Renfield's market power.

Based on their argument that market share analysis is misleading and on our implication in *Valley I* that Valley might have tried to establish market power by means other than market share, *see Valley I*, 678 F.2d at 745, Valley attempts in vain to create an inference of market power by other means. Valley focuses on Judge Posner's definition in *Valley I* of "market power" as "the power to raise prices significantly above the competitive level without losing all of one's business." *Id.* We note initially that Valley is faced with a difficult task. Absent an analysis of market share, market power "can rarely be measured directly by the methods of litigation," *id.,* and "its measurement requires sophisticated econometric analysis." *Graphic Products Distributors, Inc. v. Itek Corp.,* 717 F.2d 1560, 1570 (11th Cir.1983). *See* Landes & Posner, *supra,* at 957–58 (other approaches include estimating a firm's marginal cost and comparing that to the price it is charging, and using multiple regression techniques to determine the impact of market share on price).

Valley asserts that it has succeeded in raising an inference that Renfield has market power, citing testimony by Renfield employees Sussman and Campagna that Renfield can raise its prices on a per bottle basis by as much as $.50 or $1.00 and Renfield will not lose all of its sales, and testimony by Sussman that there was no price at which Gordon's Vodka and Gordon's Gin would *not* sell because the prod-

ucts did not sell on price alone. These employee statements, however, are insufficient to raise a genuine issue of material fact regarding Renfield's market power.

Campagna stated at another point that substantial price increases could "kill" some Renfield brands and consumers might then "walk away" from Renfield products. Furthermore, regarding Valley's claim that Renfield could raise its prices $.50 or $1.00 per bottle and still not lose sales, we agree with the district court that "[w]e have no evidence before us as to what a competitive price is for these products—perhaps a $.50 to $1.00 rise in price still keeps the product in a competitive price range."

Valley also proffers evidence that *Impact* magazine identified Renfield as the ninth largest national importer or distiller of alcoholic beverages, that Renfield was cited by a Renfield employee as one of the six largest national importers in the Chicago metropolitan area, and that two of Renfield's products, Gordon's Gin and Gordon's Vodka, are among the nation's twenty most popular brands of alcoholic beverages. These facts alone are meaningless. They do not indicate Renfield's ability to raise prices without losing its business. Renfield may be the ninth largest national importer and one of the six largest national importers in the Chicago area, but there must be other importers and suppliers who do a substantial business. Valley has not disputed that Renfield has 2%–3% of the market share in the metropolitan Chicago area or the nation. Other importers or suppliers, no matter what their size, would likely have the ability to take business away from Renfield if it raised its prices. To make the above figures significant, Valley would have to raise an inference that customers showed some loyalty to the Renfield brand. Renfield representatives testified, however, that brand loyalty in distilled spirits is negligible. Furthermore, as the district court has noted, "Valley has not denied that consumers find one brand of gin or vodka highly substitutable with another."

Valley has not supplied even the basic facts and figures necessary to render the employees' statements and Renfield's size meaningful, let alone a sophisticated econometric analysis normally necessary to show market power. Valley has therefore failed to allege facts to raise an inference that Renfield had market power at the time of Renfield's realignment. Thus Valley has not met the threshold test we articulated in *Valley I*—that the plaintiff show that the defendant has significant market power.

Valley attempts to sidestep its difficulty in creating an inference of Renfield's market power by asserting that the proper test of illegality should be based not on market power, but rather on the balancing of effects on interbrand and on intrabrand competition. This attempt to skirt the market power issue is disingenuous. As we stated in *Valley I,* a determination of market power is necessary before proceeding to the balancing of a restriction's effects on interbrand and intrabrand competition. Because Valley has failed to raise a genuine issue of material fact regarding Renfield's market power, we need not proceed to the first step of balancing the effects on intrabrand and on interbrand competition to determine whether Renfield's restraint was unreasonable. We can at this point affirm the district court's grant of summary judgment on Count II of Valley's amended complaint.

### C. Count III—Breach of Contract

Valley contends that the district court erred in granting summary judgment for Renfield on Count III of Valley's amended complaint, which alleged that Renfield breached its written distributorship agreement with Valley. Specifically, Valley argues that there are genuine issues of material fact as to whether Renfield's decision to modify Valley's distribution rights was made in bad faith and regarding whether ten days' notice of termination was insufficient, especially considering that the agreement had existed twenty-six years.

■ We disagree with both arguments. Valley has conceded that the distributorship agreement between Valley and Renfield specifically provided that Renfield had the right to terminate Valley "at any time and for any reason" on written notice. Renfield's decision fell within its power under the explicit terms of this written contract. That explicit language alone justifies Renfield's decision to modify Valley's distribution rights with ten days' notice.

Valley nonetheless maintains that Renfield's discretion is bounded by standards of reasonableness and that Renfield has acted unreasonably. Valley argues that because Renfield terminated Valley immediately before the winter holiday season, on ten days' notice, and after a twenty-six year distributor relationship, the realignment was made in bad faith.

■ Valley cites two cases, *Frank Coulson, Inc.—Buick v. General Motors Corp.,* 488 F.2d 202 (5th Cir.1974), and *Rao v. Rao,* 718 F.2d 219 (7th Cir.1983), to support its argument that Renfield has terminated Valley in bad faith. Neither case, however, is apposite. In *Frank Coulson,* the court rejected defendant General Motors' claim that it possessed an absolute privilege to intervene regarding the sale price of the Frank Coulson car dealership, stating that "GM's privilege to intervene as to the dealer's sale price is similarly limited to justifiable business interests." *Frank Coulson,* 488 F.2d at 207. Valley relies on this case to argue that Renfield had no legitimate business interest in terminating Valley without fair and adequate notice. *Frank Coulson* dealt with the scope of a privilege to interfere with a prospective contractual relationship. In this case, however, Renfield has not intervened in a relationship between Valley and a third party. Renfield has not imposed restrictions on Valley regarding retail pricing or a prospective sale of Valley's assets or stock. Valley cannot rely on *Frank Coulson* to impose a requirement of "justifiable business interest" on Renfield.

Valley also cannot rely on *Rao v. Rao,* 718 F.2d 219 (7th Cir.1983). In *Rao,* Hari Rao, a surgeon, and the Mohan Corporation (Mohan), a medical service corporation, had an employment contract that provided that at the completion of four years of service,

Hari was entitled to purchase 50% of Mohan's shares for one dollar. The agreement also provided that the employment relationship could be terminated by either party on ninety days' notice and contained a restrictive covenant whereby if Hari's employment was terminated "for any reason," Hari could not practice medicine at various hospitals in the community for a few years. Hari was sent a notice of termination on December 21, 1979, that became effective in ninety days, which not so coincidentally happened to be ten days before Hari would have obtained a 50% interest in Mohan for a dollar. The letter also included an invitation to negotiate a "new relationship" between the corporation and Hari. The district court found that Hari was a competent surgeon and a good employee and that his employment was terminated because Mohan did not want Hari to exercise his contractual right to obtain a 50% interest in the corporation. The court therefore held that although the explicit terms of the contract allowed Mohan to terminate Hari's employment and enforce the restrictive covenant, Mohan breached an implied promise of good faith by enforcing the restrictive covenant.

*Rao* is easily distinguished from this case. In *Rao,* the court of appeals accepted the district court's finding that there was sinister motive behind the termination—to prevent Rao from exercising his contractual right to obtain a 50% interest in the corporation. In this case, Valley has not raised an inference of conspiracy or any other type of sinister motive on Renfield's part. Renfield's decision to realign did not affect Valley alone, but was done as part of a statewide realignment plan. Renfield's decision was not designed to divest Valley of benefits that Valley would otherwise soon gain—as we noted earlier in our analysis of the conspiracy claim, Renfield had a legitimate independent business reason for modifying Valley's distribution rights. Finally, the *Rao* court seemed to have been most displeased with Mohan's attempt to invoke the restrictive covenant after the termination. The restrictive covenant prevented Rao from obtaining employment with other hospitals in the area and

the court seemed particularly distressed that Mohan exercised such power by terminating "for any reason." Renfield had no such restrictive covenant with Valley—Valley is not precluded from seeking other distributorships, and indeed, works as a Renfield distributor in counties other than those in the metropolitan Chicago area.

"Bad faith" is defined as "generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Black's Law Dictionary* 127 (5th ed. 1979); *see MCI Communications Corp. v. American Telegraph & Telephone Co.,* 708 F.2d 1081, 1159 n. 116 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). To succeed, Valley would have had to allege facts showing an inference of Renfield's actual or constructive fraud or sinister motive. As we have stated earlier, Valley has failed to do so. "[B]ad faith is not synonymous with erroneous judgment." *Foster Enterprises, Inc. v. Germania Federal Savings and Loan Association,* 97 Ill.App.3d 22, 52 Ill.Dec. 303, 309, 421 N.E.2d 1375, 1381 (3d Dist.1981). Valley can allege at most that Renfield made a bad business decision in eliminating Valley from three counties in the metropolitan Chicago area.

Valley's final argument is that Renfield breached its distributorship contract with Valley by providing only ten days' notice before modifying Valley's distribution rights. Valley concedes that the contract does not specifically require any set time period of notification prior to termination, but argues that ten days' notice is insufficient given the length of the distributorship relationship "and efforts expended by Valley over many years to establish Renfield's products in the market." Valley cites *Colony Liquor Distributors, Inc. v. Jack Daniels Distillery—Lem Motlow Prop., Inc.,* 22 A.D.2d 247, 254 N.Y.S.2d 547 (1964) in support of its argument. At first blush, the facts in *Colony* seem quite sim-

ilar to those of this case. Colony had provided forty-five days' notice of its termination as a distributor for Jack Daniel's, after it had served as its exclusive distributor for a twenty-one county area in northeast New York for eleven years. The *Colony* court concluded that Jack Daniel's gave Colony insufficient notice and that Colony should be entitled to remain as distributor for eighteen months. The *Colony* court, however, was faced with an oral understanding, rather than a written contract between the parties. Because the duration of the contract and notice provisions were not in writing, the court held that the duration should be reasonable, and so could be terminated on reasonable notice. *Id.* at 549–50. In this case, there is a written contract that is explicitly terminable at will. We need not read into the agreement terms we believe the parties might have agreed upon had they written out the contract.

 Furthermore, Illinois law is contrary to the *Colony* case, which was decided under New York law. " 'It has long been the holding of the Illinois courts that when an executory contract fixes no time for its operation, it is terminable at the will of either party' and without notice." *Uptown People's Community Health Services Board of Directors v. Board of Commissioners*, 647 F.2d 727, 737 (7th Cir.1981) (quoting *Kraftco Corp. v. Kolbus*, 1 Ill. App.3d 635, 274 N.E.2d 153, 156 (4th Dist. 1971)), *cert. denied*, 454 U.S. 866, 102 S.Ct. 328, 70 L.Ed.2d 167 (1981). In *Kraftco*, 274 N.E.2d at 156–57, the court cited several cases, noting that notice was not given in most of those cases, and concluded that "notice would not appear necessary." The court also noted, and rejected, the argument that "reasonable notice should be required under such circumstances." *Id.* at 157. We find that under Illinois law ten days' notice is sufficient.

Valley's case is even less sympathetic because Valley knew of the proposed distributor realignment, which *might* result in profound changes in Valley's rights, as early as July of 1981, a full four months before Renfield informed Valley of the ac-

tual realignment. Renfield had informed Valley and the other distributors in July that the end result of the realignment would probably be exclusive or dual distributorships in each of the counties in the state. At that time Valley shared Renfield distribution rights with one or more other distributors. Valley cannot assert that it had no warning of the realignment.

### III. CONCLUSION

For the foregoing reasons, we find that Valley has failed to raise genuine issues of material fact regarding its claims that Renfield conspired to fix prices, unreasonably restrained trade, and breached its distributorship agreement with Valley. We therefore affirm the district court's grant of summary judgment on all counts.

AFFIRMED.