843 F.2d 1024
 56 USLW 2629, 56 USLW 2630, 1988-1 Trade
Cases 67,964,
10 Fed.R.Serv.3d 1070, RICO Bus.Disp.Guide 6921
 FLIP SIDE PRODUCTIONS, INC., Plaintiff-Appellant,
v.
JAM PRODUCTIONS, LTD., et al., Defendants-Appellees.
FLIP SIDE PRODUCTIONS, INC., Plaintiff-Appellant,
v.
TEMPO, INC., Defendant-Appellee.
FLIP SIDE PRODUCTIONS, INC., Plaintiff-Appellee,
v.
JAM PRODUCTIONS, LTD., Chicago Jam, Inc., Jerry Mickelson,
and Arny Granat, Defendants-Appellants.
 Nos. 87-1531, 87-1547 & 87-1496.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 10, 1986.
Decided April 5, 1988.
As Amended April 8, 1988.
 
 Steven M. Kramer, Philadelphia, Pa., for plaintiff-appellant.
 William D. Heinz, Jenner & Block, Reuben A. Bernick, Rudnick & Wolfe, Chicago, Ill., for defendants-appellees.
 Before COFFEY and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.*
 COFFEY, Circuit Judge.
 
 
 1
 Flip Side Productions, Inc. (Flip Side) alleged that the defendants, Jam Productions, Ltd., Chicago Jam, Inc., Jerry Mickelson, Arny Granat (collectively, JAM) and Tempo International, Inc., MFG International, Inc., Ralph Mickelson, Robert Martwick, Norman Finkel, Lee Stern, Al Granat (collectively, Tempo), exclusively controlled the Rosemont Horizon, an "essential facility" for the booking and promotion of pop, rock, and rhythm and blues (R & B) concerts in the Chicago metropolitan area in violation of Secs. 1 and 2 of the Sherman Act. 15 U.S.C. Secs. 1, 2. Flip Side further contended that the defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. Sec. 1961 et seq. Flip Side appeals from the order of the district court granting JAM and Tempo's motions for summary judgment and imposing sanctions against Flip Side in favor of Tempo pursuant to Rule 11 of the Federal Rules of Civil Procedure. JAM cross-appeals from the order of the district court denying JAM's petition for attorneys' fees and costs. We affirm in part and reverse in part.
 
 
 2
 * Facts
 
 
 3
 A. Background.
 
 
 4
 This appeal concerns the booking and promotion of pop, rock, and R & B concerts (collectively, concerts) in the Chicago metropolitan area during the past decade by various promoters and their relationships to the owners or managers of several facilities in which concerts are performed. Promoters contract with performing artists, purchasing their services. In return, the promoter is responsible for advertising the concert, selling tickets, and obtaining a suitable concert hall. Promoters present concerts for Chicago consumers in facilities in three size categories: the arena-level facility, seating 10,000 or more; the middle-level facility seating 3,000-4,500; and the lower-level facility which seats approximately 1,000. At least 35 lower-level facilities and 16 middle-level facilities are located in the Chicago metropolitan area.
 
 
 5
 Prior to 1980, at least two arena-level facilities competed with each other in the Chicago metropolitan area: the Chicago Stadium which seats approximately 19,000, and the International Amphitheatre, which seats approximately 10,500. The Amphitheatre was constructed during the late 1930s and closed its doors in December of 1982. In its heyday, the Amphitheatre hosted many concerts as well as other events (including the Chicago National Basketball Association team "The Chicago Bulls"). The larger, privately owned Chicago Stadium is the current home arena of two Chicago-area professional sports teams: the Chicago Bulls and the Chicago Blackhawks of the National Hockey League. Throughout the year, the Stadium hosts other events, such as boxing, ice shows, circuses, and music concerts. Specifically, during fiscal years August 1, 1979, to July 31, 1983, at least 21 concerts were performed at the Stadium. Attendance at these concerts ranged from approximately 7,500 to 20,000, and only three of these concerts were attended by less than 10,000 persons. Presently, the Chicago Stadium is available for staging concerts subject only to the promoter's ability to provide the owner a satisfactory profit.
 
 
 6
 Since 1980, at least three additional arena-level facilities have been constructed in the Chicago metropolitan area: namely, the Rosemont Horizon, the Pavilion, and Poplar Creek.
 
 
 7
 In 1978 the Village of Rosemont, Illinois, decided to construct an 18,000-seat indoor arena, the Horizon, which would compete with the International Amphitheatre and the Chicago Stadium. The Horizon was to stage sporting events, circuses, ice shows, and other entertainment events. The Village of Rosemont financed the project, issuing $19 million worth of revenue bonds. To ensure the marketability of these bonds, the Village contracted with Araserv, Inc. (a concessionaire), the Ringling Brothers Barnum & Bailey Circus, and MFG International, Inc. (the corporate entity now known as Tempo International, Inc.). Pursuant to these agreements, Araserv, Ringling Brothers, and Tempo received long-term contracts for the exclusive use of the Horizon. For example, Araserv received a ten-year exclusive right to sell beverages, food, programs, etc., at all Horizon events except circuses; Tempo received a ten-year exclusive right to present no less than 50 concerts annually at the Horizon (subsequently the agreement was renegotiated to reduce the number of concerts Tempo must present to 32), and Ringling Brothers acquired exclusive rights to present a yearly circus. In exchange, the Village was guaranteed substantial license fees which were essential to the sale of the revenue bonds. Araserv guaranteed the Village a minimum annual license fee of $300,000 and further contracted to install and maintain equipment at the Horizon at a potential cost of $365,000. The Ringling Brothers guaranteed the Village 11 1/2 percent of its annual gross receipts or an annual license fee of $150,000, whichever was greater. Under its agreements, Tempo was obligated to pay a minimum license fee of $6,000 per event or $300,000 annually, again, whichever was greater. The exclusive nature of these ten-year contracts protected the guarantors Araserv, Tempo, and Ringling Brothers, allowing them the opportunity to recoup their substantial fee guarantees and expenditures. The Horizon opened its doors in May 1980, and concerts, as well as an assortment of other events, have been staged very successfully.
 
 
 8
 The Board of Trustees of the University of Illinois embarked on a new enterprise opening the 11,000-seat Pavilion on their Chicago campus in April 1982. During the previous year (1981) the University had inquired of several promoters, including JAM, as to their interest in contracting for the use of the Pavilion for staging concerts. The University eventually entered into an agreement with JAM under which JAM had the exclusive rights to present at least 30 events or commercial performances per year. In exchange, JAM guaranteed the University $250,000 per year. Also note that the Pavilion has well in excess of 100 dates available annually for the presentation of concerts or other attractions.
 
 
 9
 Lastly, the construction of Poplar Creek, an outdoor, arena-level facility, was completed after 1980, and the facility is currently available for the presentation of concerts. The record neither revealed the exact date construction of Poplar Creek was completed nor the date concerts were initially staged.
 
 
 10
 B. The Litigation.
 
 
 11
 In June 1982 Flip Side, a corporation engaged in the business of booking and promoting[1] concerts in the Chicago metropolitan market since the mid-1970s, alleged that JAM, its competitor, entered into exclusive leases with co-defendants Village of Rosemont and the University of Illinois for the right to promote concerts at two "essential facilities," namely the Rosemont Horizon and the Pavilion, owned by the co-defendants, respectively.[2] Flip Side alleged that the conduct of JAM, the Village of Rosemont and the University of Illinois, i.e., entering into exclusive leases for the use of the purported facilities, constituted monopolization of the promotion of concerts in the Chicago metropolitan area, an attempt to monopolize the relevant market, and a conspiracy, combination, and contract to unreasonably restrain trade in violation of Secs. 1 and 2 of the Sherman Act. 15 U.S.C. Secs. 1, 2. In response and during August 1982, JAM filed a counterclaim, a "mirror image"[3] of Flip Side's complaint, and a third-party complaint contending that Flip Side and its principals, Lawrence and Carl Rosenbaum, also had violated Secs. 1 and 2 of the Sherman Act by entering into an exclusive rights agreement to promote concerts at the International Amphitheatre, purported to be an essential facility from mid-1976 to mid-1980 (before the Horizon was constructed).
 
 
 12
 Subsequently, the University of Illinois filed a motion for summary judgment and on October 29, 1982, Judge Moran granted the University's motion for summary judgment, finding:
 
 
 13
 "The Pavilion has well in excess of 100 dates available annually for the presentation of concerts.... [Flip Side] has never requested permission to present a concert or even inquired about the Pavilion's availability.
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 Jam and other promoters have access for non-University events, such as rock groups. Any promoter can arrange with [the University of] Illinois for a concert or performance by its artists or performers (who, necessarily, would not be artists or performers of JAM), with a possible consequent diminution of JAM's obligation to schedule events."
 
 
 17
 (Emphasis supplied).
 
 
 18
 In April 1983, Flip Side filed its first amended complaint, joining as defendants Tempo International, Inc., a partnership specifically organized to enter into a licensing agreement with the Village of Rosemont for the presentation of concerts at the Rosemont Horizon, and Tempo International, Inc.'s owners, Ralph R. Mickelson, Alan Granat,[4] Lee B. Stern, Robert F. Martwick, and Norman D. Finkel (collectively, Tempo). Flip Side alleged that Tempo, which had an exclusive license for the use of the Horizon, had provided JAM an exclusive sublicense of its exclusive contract with the Village for the promotion of concerts at the Horizon, an essential facility in violation of Secs. 1 and 2 of the Sherman Act. In its first amended complaint, unlike in its original complaint, Flip Side no longer alleged that the Pavilion was an essential facility for the promotion of concerts.
 
 
 19
 On May 11, 1984, Flip Side filed its second amended complaint, which now included a RICO claim, and added as defendants: Franklin Fried (sole shareholder of Fried & Assoc., Inc.), Fried & Assoc. (the business entity responsible for managing the Horizon), and Paul Johnson (an employee of Fried & Assoc.). In its RICO count Flip Side alleged that the Village of Rosemont, Tempo, Fried & Assoc., Franklin Fried, and Johnson conspired to defraud recording artists performing at the Horizon by deducting phony expenses from the artists' compensation. Flip Side contended that "the JAM defendants and Tempo excluded Flip Side from the Horizon in order to prevent the performers from discovering the fraud by comparing JAM's fees with the assertedly lower fees that Flip Side would hypothetically have charged." Memorandum and Order, April 22, 1986. Flip Side further alleged that as a result of the defendants' conspiracy, it was injured "by being excluded from competition in the market."
 
 
 20
 Initially JAM moved for summary judgment and on June 12, 1984, Judge Moran denied the motion, without prejudice to its resubmission, noting that for the purposes of the motion JAM had not contested the plaintiff's allegation that the Horizon was an essential facility. In its summary judgment motion, JAM denied any liability, arguing that it had not violated the antitrust laws because it neither controlled nor excluded Flip Side from the Horizon. JAM asserted that Flip Side had access to the Horizon to promote concerts but had not attempted to contract with Tempo or the Village for the Horizon's use. Denying JAM's motion, the district court stated: "[t]he denial is based less on any conviction that there are disputed facts than it is on the belief that the motion is premature," i.e., discovery was still open.
 
 
 21
 However, JAM was not to be outdone and filed an amended counterclaim and third-party complaint reasserting its antitrust allegations against Flip Side and adding a RICO claim. JAM alleged that in April 1980 the Rosenbaums, Flip Side's owners, along with others, were indicted by a federal grand jury for 12 counts of violations of 18 U.S.C. Secs. 1341 and 1343 (mail and wire fraud). The indictment recounted the Rosenbaums' involvement in a scheme to defraud rock performers, the Chicago Park District, and the City of Chicago. According to the indictment, the Rosenbaums falsified ticket and expense information regarding four rock concerts they were promoting at Soldier Field in Chicago. Apparently, the Rosenbaums sold more tickets than they reported to the performers and the City of Chicago and kept the excess as "profit." Eventually, the Rosenbaums pleaded guilty to "knowingly, wilfully and unlawfully causing a wire communication to be transmitted in interstate commerce for the purpose of executing a scheme to defraud in violation of Title 18 [U.S.C. Sec. ]1343, as charged in count 10 of the indictment." In its RICO count JAM further alleged that the Rosenbaums used the "profits" derived from this illegal scheme to maintain and further Flip Side's purported unlawful exclusive agreement with the International Amphitheatre in order to obtain and maintain monopoly power in the arena-level market for the promotion of concerts in the Chicago metropolitan area. Based on these allegations, JAM contended that Flip Side violated RICO. 18 U.S.C. Sec. 1961 et seq.[5]
 
 
 22
 Subsequently, at the close of discovery, JAM and Tempo both submitted motions for summary judgment arguing that the Rosemont Horizon was not an "essential facility" for the promotion of arena-level concerts in the Chicago metropolitan area since other suitable facilities were available for staging concerts: namely, the Pavilion, the Stadium, and Poplar Creek. In his April 22, 1986, Memorandum and Order, Judge Moran granted the defendants' summary judgment motions and observed that Flip Side relied exclusively on the essential facilities doctrine for all its antitrust allegations. Thus, the district court applied the following legal framework taken from our decision in MCI Communications v. American Tel. & Tel. Co., 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983):
 
 
 23
 "Because a party which controls a facility--be it power lines, telephone cables or stadiums--which gives it a monopoly in one market can easily use this control to further a monopoly in another market, courts have interpreted the antitrust laws as imposing an 'obligation [on the monopolist] to make the facility available on non-discriminatory terms.' "
 
 
 24
 Memorandum and Order at 3. The district court assumed that the relevant market was the promotion of pop, rock, and R & B arena-level concerts in the Chicago metropolitan area and stated that the "[c]ompetition between Flip Side and JAM over the use of arena-level facilities is the real subject matter of this litigation." Id. at 8.
 
 
 25
 The district court noted that Flip Side originally relied on a "theory of a conspiracy 'triangle' " involving JAM, the Pavilion and the Horizon. Id. at 9. The court observed that because Flip Side no longer asserted that the Pavilion was an essential facility for the promotion of concerts, its contentions regarding the Horizon were "on very unsure footing" since it now had a "clear alternative to the Horizon, namely, the Pavilion." Id. Nevertheless, the court stated:
 
 
 26
 "... that the Horizon could be considered an essential facility if due to natural advantage, custom, restrictions of scale, or an industry wide accrediting function those who controlled the Horizon controlled the market in concert promotions in the Chicago area. Given the dynamics of the concert promotion business, the Horizon could be considered an essential facility if most performing artists who could draw an 'arena-level' crowd would perform only at the Horizon."
 
 
 27
 Id. at 10-11 (emphasis supplied). The court then proceeded to summarize the "only evidence" produced by Flip Side relevant to the question of whether the Horizon "was an essential facility because artists of a certain kind customarily performed there only." Id. at 11. This evidence consisted of depositions taken by Flip Side but never referred to in its memorandum and opposition to Tempo and JAM's motions for summary judgment.
 
 
 28
 After reviewing these depositions, Judge Moran pointed out that Lawrence Rosenbaum's testimony provided "the kernel for a theory that custom has imbued the Horizon with monopoly drawing power." Id. Rosenbaum testified:
 
 
 29
 "A. Also, another difference between the two facilities is the acceptance by the groups and agents of the Horizon and what appears to be developing as a dislike by those same people for the Pavilion.
 
 
 30
 * * *
 
 
 31
 * * *
 
 
 32
 Q. On what facts do you base the statement that some concerts--some artists prefer the Horizon over the Pavilion?
 
 
 33
 A. Information from agents."
 
 
 34
 However, relying on the deposition testimony of several promoters, the district court concluded:
 
 
 35
 "At the most, this evidence from other promoters suggests that promoters who booked for performers with large draws saw the Horizon as a desirable facility. This evidence is not enough to find that plaintiff has met its burden to establish a genuine issue as to the Horizon's essential status.... We find, therefore, that the Horizon is not an essential facility."[6]
 
 
 36
 Id. at 13-14. Significantly, Judge Moran concluded that Flip Side failed to produce any evidence that Tempo or JAM's alleged illegal conduct caused Flip Side an "antitrust injury." Id. at 16. On this basis, the district court granted the defendants' motions for summary judgment. On appeal Flip Side asserts that there is an issue of material fact as to whether the Horizon is an essential facility for the promotion of arena-level concerts in the Chicago metropolitan area. Initially, Flip Side argues that its contention that most performing artists who could draw an arena-level crowd prefer to perform at the Horizon if it was available puts at issue whether the Horizon was an essential facility. Secondly, Flip Side asserts that the testimony to the effect that the Pavilion was "not a viable facility for arena-level concerts" because it was approximately half the size of the Horizon and thus was not a practical substitute for the Horizon raises an additional question as to the Horizon's essentiality. Flip Side further contends that the Chicago Stadium was not a viable alternative because it was unavailable as a result of a third party's exclusive agreement for the promotion of concerts at that facility. Lastly, Flip Side asserts that the International Amphitheatre was neither viable nor a practical alternative to the Horizon because it "was considered 'a toilet' by JAM itself."[7] Plaintiff-Appellant's Brief, June 30, 1986.
 
 
 37
 After the district court granted the defendants' motions for summary judgment, it denied both JAM and Flip Side's petitions for fees. However, the district court granted Tempo's petition for fees "incurred in preparing material after [the time discovery was closed]" against Flip Side at the rates Tempo was actually billed during that period. Flip Side now also appeals from the order of the district court granting Tempo's petition for fees. JAM appeals from the district court's order denying its petition for fees and costs.[8]
 
 II
 Summary Judgment Standard
 
 38
 Summary judgment is appropriate when there exists "no genuine issue as to any material fact and ... the moving part[ies are] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of establishing through affidavits or otherwise, the absence of a genuine issue as to any material fact, Adickes v. S.H. Kress & Company, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), but does not necessarily have to put on evidence which negates the opponent's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Instead, the moving party may prevail by simply pointing out "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Id.
 
 
 39
 After the moving party has identified portions of the record which demonstrate the absence of a genuine issue of material fact, and the opposing party will have the burden of proof as to that fact at trial, the opposing party has "the responsibility of going beyond the pleadings and setting forth 'specific facts showing that there [is] a genuine issue for trial.' " Valley Liquors Inc. v. Renfield Importers Ltd., 822 F.2d 656, 659 (7th Cir.1987); see Celotex Corp. v. Catrett, 106 S.Ct. at 2553. "A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party." Id. We will not weigh the evidence, Id., but "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriately granted. Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the opposing party fails to establish that the facts are in dispute, the court must enter judgment in favor of the moving party. Celotex Corp. v. Catrett, 106 S.Ct. at 2553. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning a necessary element of the non-moving party's case renders all other facts immaterial.
 
 
 40
 Thus, we will affirm the district court's grant of summary judgment in favor of the defendants
 
 
 41
 "if we determine that there was no genuine issue of material fact for trial, which turns on our decision that there was insufficient evidence, taking into account the evidentiary standard of proof and drawing all reasonable inferences in [Flip Side's] favor, to allow a rational jury to decide for [Flip Side]."
 
 
 42
 Valley Liquors Inc. v. Renfield Importers Ltd., 822 F.2d at 659.
 
 III
 The Essential Facilities Doctrine
 
 43
 (The Bottleneck Theory)
 
 
 44
 At the outset, we observe that the essential facilities doctrine "is a relatively recent addition to antitrust jurisprudence." Note, Unclogging the Bottleneck, A New Essential Facilities Doctrine, 83 Colum.L.Rev. 441, 447 (1983). Initially the doctrine was used as a label, rather than as an independent tool of analysis, enabling courts and commentators to classify antitrust cases. Id.; see also P. Areeda & H. Hovenkamp, Antitrust Law, p 736.1 (Supp.1986). However, in MCI Communications v. American Tel. & Tel. Co., 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), and more recently in Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir.1986), this court adopted a four-element test as an independent method of proving antitrust violations under certain circumstances. In MCI Communications, 708 F.2d at 1133, we stated:
 
 
 45
 "The case law sets forth four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility."
 
 
 46
 In this case, Flip Side relies exclusively on the essential facilities doctrine to establish that JAM and Tempo violated Secs. 1 and 2 of the Sherman Act. Central to the essential facilities doctrine is the "control of the essential facility by a monopolist." Id. By this we mean that before a defendant can sustain antitrust liability, the plaintiff must establish the defendant's market power, i.e., the " 'power to raise prices significantly above the competitive level without losing all of one's business.' " Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 665 (7th Cir.1987) (quoting Valley Liquors, Inc. v. Renfield Importers, Ltd., 678 F.2d 742, 745 (7th Cir.1982)). Or as recently pointed out by a colleague: "Market power means the ability to injure consumers by curtailing output and raising price; no possible injury, no market power; no market power, no violation; injury to the consumers is therefore an essential ingredient of liability." Fishman v. Estate of Wirtz, 807 F.2d at 568 (Easterbrook, J., dissenting in part); see Aspen Skiing Co. v. Aspen Highland Skiing orp., 472 U.S. 585, 105 S.Ct. 2847, 2859, 86 L.Ed.2d 467 (1985). The threat to competition and ultimately to the consumer posed by a monopolist who controls and excludes its competitors from an essential facility ("sometimes called a 'bottleneck' ") is that it "can extend monopoly power from one stage of production to another and from one market into another." MCI Communications, 708 F.2d at 1132. Under these circumstances, the essential facilities doctrine is used "to preserve horizontal competition at a level other than the bottleneck." Fishman v. Estate of Wirtz, 807 F.2d at 575 (Easterbrook, J., dissenting in part). Needless to say, the threshold inquiry is whether JAM, Flip Side's competitor, has or had market power in the relevant market.[9] In other words, we determine whether the defendants' (JAM and Tempo's) alleged control of the Horizon created a "bottleneck," i.e., is the Horizon an essential facility?
 
 
 47
 The district court found, and neither appellants nor appellees challenge, that the relevant market in this case was the promotion of arena-level concerts in the Chicago metropolitan area. The district court proceeded to analyze Flip Side's essential facilities claim evaluating its evidence of "the Horizon's monopoly drawing power," i.e., that big-time recording artists performing out of arena-level facilities preferred to perform at the Horizon and not at other arena-level facilities, i.e., the Stadium, the Amphitheatre, and the Pavilion. This evidence consisted of a statement made by Lawrence Rosenbaum[10] and was the principal evidence Flip Side produced to establish that JAM, its direct competitor, exercised significant market power in the relevant market.
 
 
 48
 Further, Flip Side submitted evidence, attempting to establish that the Pavilion was not a viable facility, i.e., that it did not reasonably duplicate the Horizon. This evidence consisted of the affidavit of Danny Kresky, a concert promoter, in which he stated:
 
 
 49
 "It is also my understanding that the ... Pavilion is approximately nine-thousand in capacity, which in my opinion is not a competitive venue to the Horizon because it is about one-half the size of the Horizon."
 
 
 50
 This same affidavit included the following statement: "It is my understanding that the Chicago Stadium is not available." Carl Rosenbaum, in his affidavit, also asserted that the Stadium was unavailable, at least in 1976, because the owner of the Stadium, Arthur Wirtz, had provided, pursuant to a contract, another promoter exclusive concert promotion rights at the Stadium. On this basis Flip Side asserted that neither the Pavilion nor the Chicago Stadium could reasonably duplicate the Horizon as a concert facility. Lastly, Flip Side contended that the International Amphitheatre was more expensive and not suited for staging concerts in light of the fact that the "Amphitheatre was considered a 'toilet' by JAM itself." Thus, like the Pavilion and Stadium, the Amphitheatre did not reasonably duplicate the Horizon. In conclusion, Flip Side contended that access to the Horizon (an alleged essential facility) was necessary to promote arena-level concerts in the Chicago metro area. After years of discovery this is the extent of the evidence produced by Flip Side to establish that JAM and Tempo violated the antitrust laws.
 
 
 51
 We affirm Judge Moran's finding that the Horizon was not an essential facility for the promotion of arena-level concerts in the Chicago metro area. From our review of the record, we concur with the trial court's finding that Flip Side failed to produce specific facts establishing that there was a genuine issue for trial. The undisputed facts demonstrate (1) that Flip Side, for a time, promoted concerts at the International Amphitheatre under an exclusive agreement to do so, (2) that Flip Side admitted that the Pavilion was an arena-level facility, and further conceded that the Pavilion was available to it for staging concerts (although Flip Side apparently chose not to promote concerts there), (3) that concerts were performed at the Stadium during the relevant time period, (4) that Poplar Creek, too, staged concerts and was available as an arena-level facility, and (5) that although some artists preferred performing at the Rosemont Horizon rather than at the Pavilion, artists performed at other arena-level facilities, including the Pavilion and Stadium. There is no evidence in this record, consisting of hundreds of pages, setting aside Flip Side's accusations, fulminations and speculations, which would demonstrate that Tempo's alleged exclusive agreement with the Village and JAM's alleged exclusive sublicense agreement with Tempo instilled in JAM market power in any market or that the concert-going consumer suffered any detriment. The record contains nothing but Flip Side's speculative accusations regarding the "essential" quality of the Horizon. Drawing all reasonable inferences in Flip Side's favor, at most Flip Side produced merely colorable evidence; thus, we hold that the Horizon was not an essential facility and affirm the grant of summary judgment against Flip Side and in favor of the defendants.
 
 
 52
 Further, assuming Flip Side's best scenario, the defendants would still be entitled to summary judgment as a matter of law. Flip Side contended (1) that JAM and Tempo had exclusive control of the Horizon for the promotion of concerts, (2) that neither the Pavilion nor the Amphitheatre (while open) reasonably duplicated the Horizon, and (3) that the Stadium was unavailable because another promoter had the exclusive concert promotion rights in that facility. Under these circumstances, absent collusion between JAM, Tempo, and the promoter of concerts at the Stadium, Flip Side failed to demonstrate an antitrust injury since competition for the concert-going consumer remained as the promoters controlling the Horizon and Stadium necessarily vied for the market. In other words, the Horizon was not a bottleneck (i.e., not an essential facility). Flip Side neither provided nor has our research discovered, authority for the proposition that two competitors, each holding exclusive rights to promote a product (here concerts) from competing facilities (here two arena-level facilities) constitutes a violation of the antitrust laws where a third competitor (Flip Side) becomes defunct. The record in this case reveals that Flip Side's business failure was probably the result of its principals' dishonest and criminal activity rather than the defendants' alleged anti-competitive conduct. This was truly an antitrust "non-event." Fishman v. Estate of Wirtz, 807 F.2d at 563 (Easterbrook, J., dissenting).
 
 IV
 Flip Side's RICO Claim
 
 53
 Flip Side alleged that the defendants were engaged in a systematic "and widespread deduction of phony, artificial and false expenses from the compensation that would otherwise have been paid to the artists [who performed at the Horizon]." Flip Side contended that "as a result of the scheme, plaintiff was damaged by being excluded from competition in the market." The district court stated: "It is unclear whether Flip Side has standing to sue on a RICO claim" for the alleged scheme, and further noted that "[t]he causal connection between the alleged scheme to defraud artists and plaintiff's harm is a tenuous one: that the JAM defendants and Tempo excluded Flip Side from the Horizon in order to prevent the performers from discovering the fraud by comparing JAM's fees with the assertively lower fees that Flip Side would have hypothetically charged." The district court found Flip Side's RICO claim fatally infirm.[11] On appeal, Flip Side asserts, in one sentence, that under the Supreme Court's decision in Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 105 S.Ct. 3275, 3285-86, 87 L.Ed.2d 346 (1985), that it has standing to allege the RICO claim.
 
 
 54
 While observing that such perfunctory treatment does not generally suffice as argument before this court, we reject Flip Side's contention that it had standing to bring the RICO claim. In Sedima the Supreme Court stated:
 
 
 55
 "The plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. As the Seventh Circuit has stated: '[a] defendant who violates Sec. 1962 is not liable for trebled damages for everyone he might have injured by other conduct, nor is the defendant liable to those who have been injured.' "
 
 
 56
 Id. 105 S.Ct. at 3285-86 (quoting Haroco, Inc. v. American National Bank & Trust Company of Chicago, 747 F.2d 384, 398 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)). In Haroco we stated that:
 
 
 57
 "This holding by no means renders superfluous the requirement in Sec. 1964(c) that the plaintiff be injured 'by reason of' a violation of Sec. 1962. As we read this 'by reason of' language, it simply imposes a proximate cause requirement on plaintiffs. The criminal conduct in violation of Sec. 1962 must, directly or indirectly, have injured the plaintiff's business or property."
 
 
 58
 Flip Side alleges that its business was injured because it was excluded from the Horizon. Flip Side's only possible basis for arguing that it had a right to promote concerts at the Horizon rests on our holding that the Horizon is an essential facility for the promotion of concerts in the Chicago metro area. In light of our contrary holding, Flip Side could not have suffered an injury to its business and thus had no standing to bring the RICO claim.
 
 V
 Rule 11
 
 59
 The district court stated: "All this litigation--better termed 'warfare'--between the parties has generated its own line of attack: Rule 11 and 28 U.S.C. Sec. 1927." On March 2, 1987, the district court denied JAM and Flip Side's petitions for fees and granted Tempo's petition for fees.[12] Both JAM and Flip Side appeal from the order of the district court.
 
 
 60
 "Rule 11 of the Federal Rules of Civil Procedure provides that if an attorney files pleadings that are not reasonably based on the law or in fact, or that are meant to harass, then 'the Court upon motion or upon its own initiative, shall impose ... an appropriate sanction.' "[13]
 
 
 61
 Brown v. Federation of State Medical Boards of the United States, 830 F.2d 1429, 1433 (7th Cir.1987). In Brown we adopted the following analysis to determine whether a district court properly imposed Rule 11 sanctions. Initially, we review the district court's findings of fact with respect to the imposition of sanctions under the clearly erroneous standard. Id. at 1434. Subsequently, we review de novo the court's "legal conclusion that conduct in a particular case constitute[s] a violation of Rule 11." Id. (emphasis added). However, "the decision whether there has been a violation is a judgment call." Matter of Central Ice Cream Co., 836 F.2d 1068, 1072 (7th Cir.1987) (emphasis added). This significant distinction exists because:
 
 
 62
 "The Rule speaks of 'reasonable' pre-filing inquiry, the language of tort law. And although the definition of a frivolous legal position is itself a question of law, there will often be factual questions concerning the actual position the litigant took--questions on which the court of first instance has the leading role."
 
 
 63
 Id. Thus, although the district court's "legal conclusion" is subject to de novo review "[w]e apply a deferential standard on review of the question whether the filing of a paper violated Rule 11." Id. Further, if we hold the sanction was properly imposed, we again review the amount or type of sanction imposed under an abuse of discretion standard. Brown, 830 F.2d at 1434.
 
 
 64
 Rule 11 provides two grounds for sanctions: namely, the "frivolousness clause" and the "improper purpose" clause. Id. at 1435. The frivolousness clause requires that the party or the attorney conduct a reasonable inquiry into the facts and the law relevant to the case. Id. The improper purpose clause ensures "that a motion, pleading, or other document may not be interposed for purposes of delay, harassment, or increasing the costs of litigation." Id. at 1436. The standard for imposing sanctions under either prong of Rule 11 is an "objective determination of whether the sanctioned party's conduct was reasonable under the circumstances." Id. at 1435.
 
 
 65
 In imposing sanctions against Flip Side in favor of Tempo, the district court stated:
 
 
 66
 "Added by amendment to the original complaint, Tempo was accused of having a licensing agreement with the Horizon, but no theory or evidence was ever raised as to how such an agreement was illegal, either per se or as administered by Tempo. In fact, as Tempo states in its fees petition, 'its principal' sin appears to be a 'partial familial relationship with the JAM principals.' ... We find that Flip Side should have learned that it had no evidence of any antitrust behavior on Tempo's part by the time discovery was closed."
 
 
 67
 Implicit in the district court's finding is that it imposed sanctions under Rule 11's frivolousness clause because the court concluded that once discovery was closed, Flip Side should have known that the facts and the law then known clearly established that Tempo had not violated either the antitrust laws or RICO. As our earlier analysis of Flip Side's essential facility claims demonstrates, the district court found that at the close of discovery Flip Side had failed to produce any evidence that the alleged Tempo-JAM agreements had given JAM market power in any market. Further, Flip Side admitted that the Pavilion was an arena-level facility to which it had access to promote concerts. As previously noted, these factual findings are not clearly erroneous. At the close of discovery, because Tempo was not implicated in an antitrust or RICO violation, Flip Side was obligated to dismiss Tempo or suffer the consequences. Flip Side apparently chose the latter, and the district court, in its discretion, based upon "the actual position" Flip Side took, imposed sanctions. We hold that under these circumstances the district court properly imposed sanctions pursuant to Rule 11.
 
 
 68
 As we pointed out in Brown, the most important purpose of Rule 11 sanctions is to deter frivolous litigation and the abusive practices of attorneys. 830 F.2d at 1438. We recognized that "to avoid prolonging and complicating ... Rule 11 satellite litigation" the district court should provide specific findings when awarding substantial compensatory sanctions. Id. at 1440. In this case the district court specifically stated: "We assess those fees incurred in preparing material after that time [the close of discovery] against Flip Side at the rates Tempo was actually billed during that period." We are convinced that these findings and conclusions are sufficiently specific and allow us to "follow the path" taken by the district court. Id. at 1438. Tempo submitted a bill to the district court totaling $42,496.25 for fees incurred after the close of discovery. Flip Side asserts that this amount is excessive and unsupported. However, the district court reviewed the record and the fee requests, and we cannot say that the district court abused its discretion in imposing this sanction. It appears that Tempo expended considerable effort preparing and submitting its motion for summary judgment. Thus, we affirm the district court's imposition of fees in favor of Tempo in the amount of $42,496.25.[14]
 
 
 69
 However, the district court additionally imposed a sanction of $37,373.75 for Tempo's fees incurred responding to Flip Side's initial appeal (No. 86-1837) to this court from the order of the district court granting summary judgment for the defendants. Flip Side argues that the district court did not have jurisdiction to award fees and costs for proceedings pending in the appellate court. We agree.
 
 
 70
 Rule 38 of the Fed.R.App.P. authorizes this court to award attorneys' fees and costs if we hold that an appeal is frivolous.[15] Under Rule 38 the district court is not empowered to award fees for proceedings before this court; thus, we must reverse the finding of the district court to the extent it is inconsistent with Rule 38. However, this court is free to impose sanctions on those who abuse the appellate procedure. Before we impose sanctions, in addition to finding an appeal frivolous, we must also determine whether the case is an " 'appropriate one for the imposition of sanctions.' " Spiegal v. Continental Illinois National Bank, 790 F.2d 638, 650 (7th Cir.1986) (quoting Indianapolis Colts v. Mayor and City Council of Baltimore, 775 F.2d 177, 184 (7th Cir.1985)); see also Sparks v. NLRB, 835 F.2d 705, 707 (7th Cir.1987). Therefore, we order Tempo, if it so chooses, to submit to the clerk of this court within fifteen (15) days a brief limited to ten (10) pages addressing whether either Flip Side's appeal from the order of the district court granting summary judgment for Tempo, or its appeal from the court's order imposing sanctions, or both, are frivolous and whether sanctions would be appropriately awarded. Further, if Tempo seeks Rule 38 sanctions, it should attach to its brief a verified, itemized statement for the time expended briefing and responding to Flip Side's appeal from: (1) the order of the district court granting Tempo's motion for summary judgment, or (2) the order of the district court imposing sanctions, or both. If Tempo seeks Rule 38 sanctions, Flip Side will be allowed five (5) days to submit a responsive brief (limited to ten (10) pages).
 
 
 71
 Lastly, we summarily reject JAM's appeal from the district court's denial of its petition for attorneys' fees and sanctions pursuant to Rule 11 and 28 U.S.C. Sec. 1927. The district court found, and the record clearly demonstrates, that JAM responded to Flip Side's essential facility and RICO claims, utilizing "mirror" counterclaims and third-party complaints. Judge Moran stated:
 
 
 72
 "While we are unwilling to hold that Flip Side's pleadings against JAM groundless or to find a lack of competence on the part of Flip Side's attorneys, their behavior comes perilously close to harassment. However, we are reluctant to grant either side fees since, as Flip Side was arduously pursuing its claims, JAM (at least in theory) was likewise pursuing its counterclaims."
 
 
 73
 Mem. and Order, March 2, 1987. Although we observe that JAM has not appealed from the district court's grant of Flip Side's summary judgment motion on the essential facilities claim, to the extent JAM pursued its bogus claims, its conduct did not differ qualitatively from Flip Side's. As we noted, "the decision whether there has been a [Rule 11] violation is a judgment call," Matter of Central Ice Cream Co., 836 F.2d at 1072 (emphasis added), better left to the discretion of the district court who has a bird's eye view of "the actual positions" taken by the litigants. Id. Under these circumstances, JAM is not entitled to an award of sanctions since we hold that the district court properly exercised its discretion.
 
 
 74
 For the reasons discussed above, we affirm in part and reverse in part.
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 The parties stipulated to the following definition of "promoter":
 "Promoter is defined as a person who presents live musical entertainment events (hereinafter referred to as concerts). Concerts are performed by artists. In order to promote a concert, a promoter conducts, inter alia, the following activities:
 (a) purchases the services of an artist;
 (b) contracts with an artist or his agent to obtain that artist's services for a particular location, date and time;
 (c) contracts with the owner of a facility in which the concert is to take place;
 (d) sells tickets to the public, either directly or through ticket outlets;
 (e) advertises the concert;
 (f) forms various other activities, all of which are designed to successfully present the entertainment event to the public."
 
 
 [2]
 Flip Side further alleged that JAM had an exclusive contract with the Aragon, an "essential" mid-level facility and exclusives with the Riviera and Park West, lower-level "essential" facilities. On April 22, 1986, Judge Moran granted defendants' motion for summary judgment with respect to Flip Side's middle-level and lower-level antitrust claim, finding:
 "This claim borders on the frivolous. Defendants, in an almost humorous fashion, list the facilities in each size category which Flip Side has admitted exist. The list of middle-level facilities extend to 16. The list of lower-level facilities counts 35. No one person or company owns them all, so the issue of monopoly control, which is the key to essential facility doctrine, does not even appear."
 Flip Side has not pursued its middle- and lower-level antitrust claim on appeal.
 
 
 [3]
 JAM's counterclaim and third-party complaint recounted almost verbatim Flip Side's antitrust allegations and simply substituted itself as plaintiff and Flip Side as defendant. JAM asserted that the International Amphitheatre, rather than the Pavilion and Horizon, was the purported essential facility. Therefore, Judge Moran described JAM's counterclaim as a "mirror image" of Flip Side's complaint
 
 
 [4]
 Ralph Mickelson and Alan Granat are the respective fathers of JAM's two principals, Jerry Mickelson and Arny Granat
 
 
 [5]
 Flip Side later brought a motion for summary judgment on the basis that the statute of limitations had run on the alleged RICO claim. The district court granted the motion concluding that JAM's RICO claim was untimely. Memorandum and Order, April 22, 1986
 
 
 [6]
 The district court further found that even if the Horizon was considered an essential facility for the promotion of concerts in the Chicago area, Flip Side failed to prove that it had been excluded from the Horizon. The court observed that Flip Side "while managing to produce documents which stack over two feet high, ... has not produced a single copy of an alleged 'written' [exclusive] agreement" between Tempo and JAM. Id. at 14. The court pointed out that "the closest Flip Side goes to proving such an exclusive agreement is Zuckerman's [a promoter] testimony that a rumor existed that JAM had an exclusive at the Horizon. This does not satisfy Flip Side's burden of proof to produce evidence that would put its contentions in dispute." Id. at 15. Lastly, the district court found that Flip Side failed to produce any evidence "that the alleged [exclusive] agreement was intended to exclude competitors or that it had such an effect." Id. at 16
 
 
 [7]
 Flip Side apparently referred to the following deposition testimony of Jerry Mickleson, a JAM owner:
 "Q: [Steven Kramer--appellant's counsel] Have you ever stated that you woul d never do a show at the Amphitheatre?
 A: I may have stated that somewhere along the line.
 * * *
 Q: Okay. Have you ever referred to the Amphitheatre as a toilet?
 A: I may have."
 
 
 [8]
 Oral argument was initially heard on December 10, 1986, while JAM's counterclaim and third-party complaint were still pending in the district court. Consequently, we dismissed appeal no. 86-1837 for lack of jurisdiction because the April 22, 1986, Memorandum and Order was not a final appealable order. Subsequently, on March 2, 1987, the district court granted Flip Side's motion for summary judgment on the counterclaim, finding that the International Amphitheatre was not an essential facility for the promotion of rock concerts in the Chicago metropolitan area. The court noted ironically that JAM had "jumped its own fence" to argue that the Amphitheatre was an essential facility despite having argued strenuously that the Stadium was and still is available for staging rock and other concerts. JAM has not appealed from the district court's granting of Flip Side's motion for summary judgment but appeals from the court's denial of JAM's petition for fees and costs. Flip Side appeals from the summary judgment order in favor of the defendants and also from the court's imposition of sanctions pursuant to Rule 11 in favor of Tempo. By an order of this court on April 13, 1987, we consolidated these appeals and have decided the merits of the antitrust allegations on the basis of the briefs filed and argument heard in appeal no. 86-1837
 
 
 [9]
 Flip Side alleged that Tempo had an exclusive contract with the Village of Rosemont for the presentation of concerts at the Horizon and further alleged that JAM had an exclusive sublicense for the promotion of concerts at the essential facility. This is a form of vertical organization in that Flip Side and JAM compete for the use of arena-level facilities, i.e., compete with each other for the presentation of concerts to consumers in the Chicago metropolitan market. JAM and Flip Side also compete for different performing artists. On the other hand, Tempo does not compete directly with Flip Side because it neither recruits artists nor actually promotes concerts itself; rather, it sublicenses its exclusive agreement to present concerts at the Horizon to various promoters, including JAM
 
 
 [10]
 Lawrence Rosenbaum testified, inter alia:
 "A. Also, another difference between the two facilities is the acceptance by the groups and agents of the Horizon and what appears to be developing as a dislike by those same people for the Pavilion.
 * * *
 Q. On what facts do you base the statement that some concerts--some artists prefer the Horizon over the Pavilion?
 A. Information from agents."
 
 
 [11]
 The court further noted that even if Flip Side did have standing, it had failed to produce any evidence of fraud
 
 
 [12]
 Tempo moved for sanctions under both 28 U.S.C. Sec. 1927 and Rule 11. Sec. 1927 provides only for the imposition of sanctions against counsel while Rule 11 provides for sanctions against both parties and their attorneys. See Ordower v. Feldman, 826 F.2d 1569, 1573 (7th Cir.1987). The district court assessed fees against Flip Side only; thus, we proceed with our analysis treating the district court's imposition of sanctions under Fed.R.Civ.P. 11
 
 
 [13]
 Rule 11 provides:
 "Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed properly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the Court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee."
 Fed.R.Civ.P. 11 (1986).
 
 
 [14]
 The district court found that Tempo only requested fees and not costs. Tempo does not challenge the district court's finding; thus, we affirm the award of $42,496.25 (rather than the $44,253.05 total including costs noted in Tempo's brief)
 
 
 [15]
 Rule 38 provides: "If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee."